## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BARBARA K. FELDER, as Personal Representative of the Estate of Marvin Felder, Deceased | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-0910 (CKK) |
| MIKE JOHANNS, Secretary, U.S. Department of Agriculture | ) ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

KIM D. MANN, D.C. Bar # 81471
Scopelitis, Garvin, Light, Hanson & Feary
1850 M Street, N.W., Suite 280
Washington, DC 20036-5804
(202) 783-9222
(202) 783-9230 (fax)

**Attorney for Plaintiff**
**Barbara K. Felder**

## TABLE OF CONTENTS

**Introduction** ................................................................................. 1

**Factual Background** ..................................................................... 2

    I.    The Promotion Denied ....................................................... 2

        A.   The 1999 Case ............................................................ 2

        B.   The Parties' Post-1999 Case Negotiations ................... 4

    II.   The Agency Rationale For Non-Promotion ......................... 9

        A.   During Negotiations ................................................... 9

        B.   At The Mid-2004 EEO Investigative Stage .................. 9

        C.   In November 2007 Depositions ................................... 13

**Legal Argument** ........................................................................... 15

    I.    Motion To Dismiss ............................................................ 15

    II.   Motion For Summary Judgment ......................................... 15

        A.   The Standard of Review .............................................. 15

        B.   Exhausting Administrative Remedies ......................... 16

            1.  The "Discriminatory Event" is the Personnel Action ................. 17

            2.  Mr. Felder Gains Personal Knowledge of Personnel ................. 18
                 Action at October 30, 2003 Meeting

            3.  The Agency Should be Estopped from Asserting ...................... 22
                 Mr. Felder's Knowledge Dates Back to the
                 January 15, 2003 Letter

        C.   Disparate Treatment Claim .......................................... 23

            1.  The Comparator, Mr. Simmons, Is Sufficiently Comparable ..... 24

            2.  . . . And So Are 10 Other IS Employees .................................... 27

            3.  Inference of Discrimination Remains Even in the ...................... 28
                 Absence of Comparators

            4.  The Failed Search For A Comparator Is A Pretext ...................... 29

               a.   Even IS's Reason For Selection of the Articulated .............. 29
                    Rationale Remains Hidden

               b.   The Evolution of the Articulated Reason ........................... 31

               c.   The Evidence of Incredulity Is Overwhelming .................... 33

**Conclusion** ................................................................................... 37

# TABLE OF AUTHORITIES

## Federal Cases

*Aspex Eyewear, Inc. v. E'lite Optik, Inc.*, 276 F.Supp.2d 1084 (D. Nev. 2003) ..........................37

*Bowden v. United States*, 106 F.3d 433 (D.C. Cir. 1997) .......................................................16

*Brady v. Office of Sergeant At Arms*, __ F.3d __, 2008 WL 819989
(D.C. Cir. Mar. 28, 2008)...................................................................................23, 24

*Chaple v. Johnson*, 453 F.Supp.2d 63 (D.D.C. 2006) ............................................................23

*Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000) ...........................................................34

*Felder v. Glickman*, Civil Action No. 99-1860 .......................................................................2

*George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005) ...........................................24, n.9, 28, n.12

*Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000)...............................................28 n.12

*Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007), *cert. granted* __ U.S. __,
128 S.Ct. 30, 168 L.2d.2d 807 (2007) ...................................................................25

*Intex Recreation Corp. v. Metalast, S.A.*, unreported, 2005 WL 5099032
(D.D.C. Mar. 2, 2005)..............................................................................37, n.14

*In re EchoStar Communications Corp.*, 448 F.3d 1294 (Fed. Cir. 2006).........................37, n.14

*James v. England*, 332 F.Supp.2d 239 (D.D.C. 2004) ...............................................17, 18, n.8

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843 (D.C. Cir. 2006) ...........................24, n.9, 34

*McCants v. Glickman*, 180 F.Supp.2d 35 (D.D.C. 2001) ...................................................18, n.8

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)........................................................23

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002....................................................23

*Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344 (3rd Cir. 1999) ..................................24, n.9

*Scarborough v. Natsios*, 190 F.Supp.2d 5 (D.D.C. 2002) ...........................................17, 18 n.8

*Silver v. Leavitt*, unreported, Civ. A. 05-0968, 2006 WL 626928 (D.D.C. Mar. 13, 2006)...18 n.8

*Singleton v. Harkins*, 1996 WL 33322370 (D.D.C. 1996) ................................................18, n.8

*Singleton v. Potter,* 402 F.Supp.2d 12 (D.D.C. 2005) .........................................................23

*Smith v. Jackson*, ___ F.Supp.2d ___, 2008 WL 623230 (D.D.C. Mar. 10, 2008) ..............24, 29

*South v. Ill. EPA*, 495 F.3d 747 (7th Cir. 2007)....................................................................25

*Stella v. Mineta*, 284 F.3d 135 (D.C. Cir. 2002) ...........................................................24, n.9

## Docketed Cases

*Felder v. Glickman*, Civ. A. No. 99-1860  (GK).......................................................................2

## Federal Regulations

29 CFR § 1614.105(a)(1) ....................................................................................................2, 16

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 12(b) ........................................................................................................1, 15
Fed. R. Civ. P. 12(b)(6) ....................................................................................................1, 15
Fed. R. Civ. P. 56...........................................................................................................1, 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **BARBARA K. FELDER, as Personal Representative of the Estate of Marvin Felder, Deceased**<br><br>　　　　　**Plaintiff,**<br><br>**v.**<br><br>**MIKE JOHANNS, Secretary, U.S. Department of Agriculture**<br><br>　　　　　**Defendant.** | **Civil Action No. 06-0910 (CKK)** |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S RENEWED MOTION
<u>TO DISMISS OR FOR SUMMARY JUDGMENT</u>**

**INTRODUCTION**

Plaintiff Barbara K. Felder, in her capacity as personal representative of the estate of Marvin Felder ("Plaintiff"), submits Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Renewed Motion to Dismiss or For Summary Judgment ("Motion"), filed March 18, 2008.  The Motion, to the extent it seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(6), must be treated as a request for summary judgment because it relies upon appended materials outside the pleadings and not the proper subject of judicial notice.  To the extent the Motion seeks summary judgment pursuant to Fed. R. Civ. P. 56, it must be denied because, as demonstrated in this Opposition Memorandum, there are genuine issues as to material facts that Plaintiff is entitled to present to a jury for resolution.  The Seventh Amendment to the federal Constitution requires no less.

Defendant contends the Court should grant summary judgment on two separate alternative grounds: Mr. Felder failed to exhaust his administrative remedies because, contrary to the mandate of 29 CFR § 1614.105(a)(1), he failed to contact an EEO counselor within 45 days of the adverse employment action, namely his instatement in Defendant's subagency, International Services, as an FP-2 rather than as an FP-1; and the alleged disparate treatment accorded Mr. Felder in comparison to Mr. Simmons, namely refusing to promote Mr. Felder while promoting Mr. Simmons, was neither disparate nor taken for discriminatory reasons.

Plaintiff will show in this Opposition Memorandum that sufficient facts of record are present to establish that Defendant's exhaustion argument focuses upon the incorrect event, and thus the incorrect date, of the adverse employment action, Mr. Felder's FP-2 instatement, that Mr. Felder and Mr. Simmons and 10 other IS employees were sufficiently similarly situated, particularly in light of the criteria upon which the Agency relied to deny Mr. Felder a promotion while awarding Mr. Simmons one, and that the reasons Defendant now offers for not promoting Mr. Felder are disingenuous and a pretext for race-based discrimination.

<strong>FACTUAL BACKGROUND</strong>

**I.**   **The Promotion Denied**

    **A.   The 1999 Case.**

Marvin Felder, deceased husband of Plaintiff, and Alester Van Simmons filed suit as co-plaintiffs in July 1999 against Defendant in U.S. District Court for the District of Columbia. In their joint complaint, docketed as Civil Action No. 99-1860 and captioned *Felder v. Glickman* ("1999 Case"), they allege Defendant discriminated against them because of their race, African-American, in violation of Title VII of the

Civil Rights Act of 1964, when refusing to select them from a 1997 roster of qualified applicants to fill management-level vacancies in International Services ("IS"), a unit within USDA's agency, Animal and Plant Health Inspection Services ("APHIS"). At the time of their applications to IS, Messrs. Felder and Simmons were management-level employees in Plant Protection and Quarantine ("PPQ"), a separate sister unit within USDA/APHIS. Mr. Felder was at the time a GS-13 within APHIS/PPQ while Mr. Simmons was a GS-12 Supervisor. Def. Mem. Ex. 6 at 3.[1]

Following favorable jury verdicts, Messrs. Felder and Simmons successfully opposed Defendant's post-trial motions to overturn those verdicts. Judge Kessler, in her Memorandum Opinion, entered February 4, 2002, attached hereto as <u>Exhibit A</u> sustaining the jury verdicts, also denied Defendant's motion for a new trial predicated in part upon Defendant's allegation that the jury awards of similar amounts to both co-plaintiffs were inconsistent with the evidence establishing Mr. Simmons had been subjected to more instances of discrimination than Mr. Felder. Judge Kessler explains the jury's refusal to differentiate between the total awards to each "on the basis of testimony that Plaintiff Felder was the person who first initiated the EEO activity and in general played a leadership role." Ex. A, Kessler Mem. Op. at 9, fn. 3. Judge Kessler's accompanying order granted in part co-plaintiffs' motion for equitable relief:

> Plaintiffs are awarded instatement to the first opening or vacancy which becomes available in IS, back pay to the dates on which the first and second vacancies in IS were filled after creation of the roster on which each Plaintiff was placed (without regard to whether selections were made from those rosters and without regard to whether selections were made from within or without IS).

Def. Mem. Ex. 1.

---

[1] References to lettered exhibits are to attachments to this Opposition Memorandum. References to numbered exhibits are to attachments to Defendant's Supporting Memorandum ("Def. Mem.").

**B.    The Parties' Post-1999 Case Negotiations**

Following the conclusion of the 1999 Case, co-plaintiffs Felder and Simmons, Defendant, and their respective counsel engaged in protracted negotiations, taking the form of meetings, telephone calls, emails, and letters starting in September 2002, to work out the details of the instatement of Messrs. Felder and Simmons in IS as Judge Kessler's order of February 4, 2002 directs.  Defendant's Supporting Memorandum attaches as exhibits selected copies of these exchanges.  These and others omitted from its Memorandum are summarized below.

By letter dated September 26, 2002 from Assistant Deputy Administrator Wyss to Mr. Felder (Exhibit B hereto), the Agency proffers Mr. Felder its initial written offer of an assignment in IS, employing essentially the same wording as its subsequent January 15, 2003 letter upon which Defendant relies in its Supporting Memorandum, characterizing it as a second written notice of assignment.  Def. Mem. at 5.  The September 26, 2002 letter omits, however, any reference to an offer of an FP-2 step, a base salary, or the position description, all proposed terms of employment included in the Agency's subsequent revised-offer letter of January 15, 2003.  Other than that, the revised-offer letter is identical, including the representation that it "constitutes your assignment" and solicits a written acceptance from Mr. Felder.

Mr. Felder responds to the initial September 26, 2002 offer from Assistant Deputy Director Wyss on October 9, 2002.  *See* attached Exhibit C.  He tentatively accepts the position offered in Seoul, Korea, but again "pending all issues being resolved," and refers Dr. Wyss to a concurrently written letter from his counsel to the U.S. Attorney who served as Agency trial counsel.  *See* Def. Mem. Ex. 3 at 1.  Counsel's letter of October 9, 2002 reaffirms Mr. Felder's general acceptance of the position

-4-

offered, subject to further discussion with IS regarding "certain aspects of these selections, including the terms and conditions not mentioned in Dr. Wyss's letter." While the October 9, letter characterizes the offered position (APHIS Area Director) and its location (Seoul, Korea) as not posing issues for Mr. Felder, it lists six open issues for review at a requested meeting with IS officials, including step increases and promotion potential.  As of October 9, 2002, the Agency has not notified Mr. Simmons of his "paper promotion" as Defendant refers to it.  Def. Mem. at 2.  That notification does not occur until almost five months later, in Dr. Wyss's letter of February 27, 2003 to Mr. Simmons.  *See* Def. Mem. Ex. 12.[2/]

The October 9, 2002 letter from counsel precipitates the requested meeting between the former plaintiffs and IS officials, including counsel, occurring on December 6, 2002.  *See* Def. Mem. Ex. 11, a letter dated January 31, 2003, from Mr. Felder's counsel to Agency trial counsel.  As numbered paragraph four of that letter notes, that meeting results in "an improved offer from IS" for Mr. Simmons, an offer actually made worse, however, by the subsequent January 15, 2003 revised Agency offer to Mr. Simmons.  The January 31 letter also reflects ongoing efforts to persuade the Agency to revise its offers to Messrs. Simmons and Felder, to clarify issues, and to address the conditions and concerns raised by both former plaintiffs.  *Id.* In other words, the negotiations remain open and ongoing and subject to further counteroffers as well as to requests for counteroffers.

As a result of these ongoing negotiations, the Agency makes a revised offer or counteroffer to Mr. Simmons by letter dated February 27, 2003, described in

---

[2/] This possible "paper promotion" is alluded to in materials distributed to Mr. Simmons at an earlier meeting with IS officials, on December 6, 2002.  *See* paragraph numbered 4 in the January 31, 2003 letter to Agency counsel. Def. Mem. Ex. 11.

that offering letter as "your new assignment."  *See* Def. Mem. Ex. 12.  This letter discloses for the first time a written offer of a "paper promotion" for Mr. Simmons, from an FP-4 to an FP-3 position.

With respect to Mr. Felder, a letter dated April 14, 2003 from Mr. Felder's counsel to Agency counsel, Def. Mem. Ex. 17, confirms that further negotiations are to take place regarding the second revised offer to Mr. Felder set forth in Dr. Wyss's letter of January 15, 2003 (Def. Mem. Ex. 10).  The April 14 letter observes: "two hurdles remain in the way of his accepting the offered position."  After addressing the proper step increase Mr. Felder should receive upon his acceptance into IS, it concludes with another request on behalf of Mr. Felder to meet with high-level IS officials "before officially accepting the position offered in IS."  The letter spells out the specific issues to be discussed at such a meeting.  *Id.*

Mr. Felder confirms the details of the agenda for the meeting with IS officials in an email to the Agency counsel, dated April 22, 2003.  *See* Def. Mem. Ex. 18.  Agency counsel responds by letter dated May 9, 2003, attached as <u>Exhibit D</u>.  It demands an unconditional written response, accepting or rejecting "the <u>offered</u> positions" in IS. (Emphasis added.)  The Agency letter also addresses questions and concerns of Mr. Felder and agrees to facilitate a meeting with IS officials once Mr. Felder submits his acceptance letter, described as an orientation meeting, but to include "other issues as appropriate."  *Id.*  Mr. Felder responds through counsel to the May 9, 2003 letter from Agency counsel.  This response, dated May 19, 2003, accepts "the offer of employment

in IS," but again subject to pursuing the open issues in the face-to-face meeting now scheduled with named IS officials.[3/]  *See* Def. Mem. Ex. 19.

Mr. Felder continues to negotiate terms with Agency officials, but now above the level of Dr. Wyss.  On September 25, 2003, he sends an email to IS Deputy Administrator Ralph Iwamoto requesting a meeting with him and Agency Administrator Mr. Bobby Acord while Mr. Felder is in Washington, DC for his October 2003 orientation session.  That email, attached as Exhibit E, sets forth four specific topics Mr. Felder wishes "to resolve" at that meeting.  One is the "difference in handling the particulars of my case in comparison with the handling of Mr. Simmons case (promotion)."  The meeting with IS Deputy Administrator Iwamoto, his Associate Deputy Gutierrez, and others takes place on October 30, 2003.  *See* attached Exhibit F, an email from Stacy Newton, Program Assistant at IS, dated September 29, 2003, to Mr. Felder, among others.  As discussed below, that meeting concludes the discussions between Mr. Felder and the Agency over his assigned FP class.  He accepts the assignment with the FP-2 grade.  Dr. Wyss confirms this acceptance in his letter to Mr. Felder, dated December 5, 2003, stating the effective date of his transfer will be December 28, 2003.  *See* attached Exhibit G.

The Amended Complaint specifically alleges Mr. Felder knew on October 30, 2003, the date of his meeting with Deputy Administrator Iwamoto *et al.*, that the terms of his Agency's assignment were not going to include an FP-1 position when he reported to Seoul.  *See* the formal EEO complaint he filed with the Agency on December 15, 2003, attached as Exhibit H.  An earlier signed version of that EEO

---

[3/] The subsequent email from Mr. Felder's counsel to the U.S. Attorney who served as Defendant's trial counsel refers to this "acceptance" of the position as unequivocal, but the terms and conditions were still open issues for discussion at the meeting with IS officials.

complaint, attached Exhibit I, includes an attachment giving more detail about that October 30, 2003 meeting.  It states that Mr. Felder met on October 30, 2003 with Messrs. Iwamoto, Gutierrez, Fedchock, and Wyss to discuss his entry into IS.  He describes there the outcome of the meeting as well as the topics discussed: "I also discussed the fact that Mr. Simmons was given a promotion and I was not.  Mr. Iwamoto told me that he was told I received a promotion, in fact I did not.  Then all agreed that they thought I should have received all the rights and privileges of my position since January 1994."  Id.[4]  That attachment also indicates Mr. Felder felt the outcome of the October 30 meeting led him to believe he had been discriminated against.

Thus, it is clear the Agency representatives as well as Mr. Felder considered the self-serving designation "assignment" set forth in the letters of September 26, 2002 and January 15, 2003 as little more than an Agency negotiating tactic or strategy for pursuing closure on a series of offers, counter-offers, and revised offers, all in fact subject to acceptance and negotiable as to the particulars of their terms, including whether Mr. Felder would report to his new duty station in IS in Seoul, Korea as an FP-1 or an FP-2, the former requiring the type of "paper promotion" that Mr. Simmons had received.  While Mr. Felder may have known by February 27, 2003 that Mr. Simmons had received a promotion, he did not know until October 30, 2003 that he would not be receiving one.  The official action of the Agency instating Mr. Felder in IS as an FP-2, and not as an FP-1, does not occur until December 28, 2003, the date of

---

[4] A follow-up email, dated November 18, 2003, from Associate Deputy Gutierrez, with a copy to Dr. Wyss, confirms that IS Management understood from discussions at the October 30 meeting that Mr. Felder was still pushing for a promotion to an FP-1 in conjunction with accepting the Seoul, Korea assignment.  See attached Exhibit J.

his conversion from a GS-grade employee in APHIS/PPQ to an FP-class employee in APHIS/IS.  *See* Ex. G, the December 5, 2003 letter from Dr. Wyss to Mr. Felder.

## II.    **The Agency Rationale for Non-Promotion**

### A.    **During Negotiations**

Despite Mr. Felder's repeated requests during the negotiation process for a "paper promotion" to an FP-1, Defendant offers no rationale for turning him down until Agency counsel's letter of May 9, 2003 to counsel for Mr. Felder.  *See* attached Ex. D. There, Counsel Campbell states:

> **Promotion to FP-1**.  The Agency has agreed to place Mr. Felder into a FP-2 position equivalent to his current salary.  The record is clear that most individuals working in IS in 1997 at the FP-3 level remain at the FP-2 level today.  Therefore , the Agency has offered Mr. Felder a FP-2 position.  Mr. Felder will be eligible for promotion to the FP-1 level and will be subject to IS promotion rules and regulations. USDA is unable to give Mr. Felder preferential treatment with regard to promotion to the FP-1 level after one year of service.

Ex. D at 2.  This is the first and only time, prior to responding to Mr. Felder's EEO complaint during the investigative stage of the EEO process, the Agency discloses the reason why, at least at that juncture, it is not willing to promote Mr. Felder to an FP-1.

### B.    **At the Mid-2004 EEO Investigative Stage**

After offering a single reason for not promoting Mr. Felder to an FP-1 -- "most" IS employees working in IS in 1997 as FP-3s remain, as of May 2003, at the FP-2 level -- Agency officials, during the course of the Agency's May 11-to-July 15, 2004 EEO investigation of Mr. Felder's EEO complaint, begin to develop a string of different "reasons."  These "reasons" are reflected in Agency affidavits that IS officials furnished the Agency's EEO investigator, included in her Record of Investigation ("ROI") in this case, most of which Defendant appends to his Memorandum as exhibits.

In his own initial affidavit furnished the EEO investigator on May 11, 2004, Mr. Felder reveals he had been advised the Agency had proffered the EEO counselor its rationale for non-promotion: its search for "comparatives" (comparable to Mr. Felder), defined as IS employees who entered IS at the FP-3 level and were promoted to FP-1 since 1997, yielded no such comparators. Felder Aff., Def. Mem. Ex. 2 at 2. As Mr. Felder points out, the Agency knew in advance there would not be, because there could not be, any such "comparators" because, under existing Agency hiring policy, IS does not hire externally, from the outside, only internally, to fill management-level vacancies. *Id.; see also* Felder Rebuttal affidavit given the EEO investigator and included in her ROI, attached hereto <u>Exhibit K</u> at 1. The Agency's Freida Skaggs in her deposition testimony confirms the accuracy of Mr. Felder's understanding of the IS hiring policy, promoting only from within to fill management-level positions. <u>Exhibit L</u> at 12-13. Ms. Skaggs concedes that if, as a result, no manager entered or came into IS off the roster between June 1997 and December 1998, neither Mr. Felder nor Mr. Simmons could receive a paper promotion under the "comparative" criterion employed. *Id.* at 41-43. Mr. Felder provides the EEO investigator a list of IS "internal" employees who, since 1997, IS promoted from FP-2 to FP-1, some moving from FP-3 to FP-2 to FP-1 during this timeframe. Felder Aff., Def. Mem. Ex. 2 at 2.

In response to Mr. Felder's May 11, 2004 affidavit (Def. Mem. Ex. 2), Agency officials submit affidavits of their own to the EEO investigator elaborating on IS's rationale for not promoting Mr. Felder:

    **1.**    <u>**Ralph H. Iwamoto, Jr.**</u>, IS Deputy Administrator. Mr. Iwamoto confirms that State Department Foreign Affairs policy should have controlled Mr. Felder's grade or class level and salary upon entering IS. *See* Iwamoto Aff., attached as <u>Exhibit M</u>, at 3. When asked to explain "the policy and practice for promotion from FP-1 to FP-2,"

Deputy Administrator Iwamoto declines to answer, referring the question to IS Administrative Services staff. *Id.* Likewise, he does not know whether any identified IS employees had been promoted to FP-1 positions since 1997. *Id.*

      **2.** **Freida Skaggs**, IS Director of Personnel. Ms. Skaggs states that IS uses the Department of State Foreign Affairs Manual as "guidance" on hiring, but asserts the Agency's Office of General Counsel made the final decision on Mr. Felder's salary level, *i.e.* his FP-level. Skaggs Aff., Def. Mem. Ex. 6 at 2. She claims the USDA Office of General Counsel instructed her to search Agency records to locate employees entering IS during the 18-month period June 9, 1997 through December 9, 1998. There was only one, a Mr. Ken Nagata.[5] Even though Mr. Nagata entered IS as an FP-5 (a non-management position) and was promoted to an FP-4 in 2002, the Office of General Counsel instructed her to treat Mr. Nagata as "parallel to Mr. Simmons" because he was "close in grade level to Mr. Simmons" -- Mr. Simmons entered IS as an FP-4. *Id.* at 3-4. Because of this paralleling with Mr. Nagata, IS brought Mr. Simmons in at the FP-3 level, in effect paper promoting him from FP-4. *Id.* at 4. Ms. Skaggs states that IS employees not in the same occupational series as Mr. Felder could not be considered "comparatives" of Mr. Felder: "all promotions are considered within series." *Id.* at 5; a*ccord*, Skaggs Deposition Testimony, Ex. L at 35-36, 39.

      **3.** **John H. Wyss**, IS Assistant Deputy Administrator. Dr. Wyss confirms that Defendant's Office of General Counsel made the final decision on Mr. Felder's salary, *i.e.*, his FP entry level. Wyss Aff., Def. Mem. Ex. 8 at 2. He states his Agency follows the Department of State and USDA Foreign Agriculture Service policies on

---

[5] While Defendant continues to redact surnames from affidavits appended to its Memorandum, those names are already of public record, appearing without deletions in the Agency's ROI in this case. For convenience and to avoid confusion, this Opposition will continue to identify these IS employees by their full names as reflected in the ROI.

lateral entries into IS and followed them in the case of Mr. Felder and Mr. Simmons; however, he concedes IS used the presence or absence of a "comparative" to determine whether either former plaintiff would be promoted prior to his conversion to IS employment.  *Id.* at 3.  As to what constituted a "comparative" in Mr. Felder's case, Dr. Wyss states it is an employee entering IS in 1997 as an FP-3.  *Id.*  Based on this criterion, the Agency concludes Mr. Felder had no comparatives and, thus, received no promotion.  *Id.*  While Dr. Wyss does not expressly cite "same series" as an additional comparative criterion, he notes that Mr. Felder was in the 436 series, but currently is in the 401 series, whereas some of the other IS employees on Mr. Felder's list of those who had been promoted to FP-1 were in other series.  He comments that "promotional opportunities are series specific."  *Id.* at 4.  Dr. Wyss also states that normally it is easier to be promoted from FP-4 to FP-3 than it is to be double-promoted from FP-3 to FP-2 and then to FP-1.  *Id.* at 3.

In response to the reply affidavits from IS officials, Mr. Felder provides the EEO investigator a sworn rebuttal affidavit, dated July 21, 2004.  *See* Exhibit K.  Mr. Felder points out that Dr. Wyss's "comparative" rationale is inconsistent with the "paper promotion" it gave Mr. Felder, a promotion from the FP-3 he would have received had he entered in IS in 1997 to the FP-2 he received when he started in January 2004.[6/] Ex. K at 2.  He also cites an August 15, 2003 memorandum from IS Deputy Administrator Iwamoto to all IS employees, "confirming that the GS-401, GS-436, and GS-414 series in IS are considered interchangeable series for purposes of promotion [within IS]."  Ms. Skaggs ultimately agrees, Ex. L at 60-61, as does its author, Mr.

---

[6/] Defendant attempts to camouflage this mandatory "paper promotion" by passing it off simply as giving Mr. Felder more favorable treatment than he deserved.  *See* Def. Mem. at 20.  The Agency had no choice: at Mr. Felder's then current salary upon conversion to IS, IS had no equivalent salary bracket at the FP-3 level.  It had to start him at an FP-2 level if it were not going to give him a paper promotion.  Def. Mem. Ex. 2 at 2; Ex. K ¶ 4.

Iwamoto.   *See* Iwamoto Dep., <u>Exhibit N</u> at 23-24.   This Iwamoto memorandum is attached as <u>Exhibit O</u>.   Mr. Felder in rebuttal also points out that, contrary to the "same-series" assertions of Dr. Wyss and initially of Ms. Skaggs, other IS employees moved freely from one job series to another, citing two specific examples of employees from the GS-701 and GS-431 series moving to the GS-401 series. Ex. K at 2.  He objects to the Wyss "comparative" criterion, limiting comparatives to employees entering IS in 1997, because it effectively ignores Mr. Felder's own 26 years of experience as a GS-436 employee in the same agency as IS employees, including the last 21 years spent as a manager with assigned duties similar to those of IS employees at the FP-3 through FP-1 levels.  *Id.*  He disputes the "comparative" status accorded Mr. Nagata because, unlike Mr. Simmons, Mr. Nagata entered IS as an FP-5 (a non-management position) and then received two promotions, to an FP-3 level, between 1997 and 2003.  *Id.*

### C.   In November 2007 Depositions

Agency officials in their November 2007 court depositions further reveal IS's alleged rationale for refusing to promote Mr. Felder.  Ms. Skaggs three years later concedes the Agency did not use the IS Foreign Affairs Manual in connection with processing Mr. Felder's request for promotion, Ex. L at 32-33, and, furthermore, reports that this Manual contains nothing about the relevancy of same-series or agency longevity to promotion eligibility or potential.  *Id.* at 55.  She and Dr. Wyss acknowledge she or they prepared six charts or tables provided to Dr. Wyss and Agency counsel, at the request of Agency counsel, identifying, on a year by year basis from 1997 through 2002, all employees who served in IS at the FP-2 level, showing for each those who received promotions to FP-1 that year and those who did not. Skaggs

Dep., Ex. L at 20-22, 45, 48-49; Wyss Dep., <u>Exhibit P</u> attached, at 16-20.[7/]   The Skaggs charts, Wyss Deposition Ex. 1, are attached as <u>Exhibit Q</u> hereto.  The charts or tables do not reveal when the listed FP-2 employees received their promotions from their prior FP-3 level positions, *i.e.* how long they had been serving as FP-2s.  Ex. L at 50-51; Ex. P at 42-43.  Mr. Wyss admits that this length of time is not only a relevant factor in terms of promotion potential, but a relevant factor in determining whether Mr. Felder had any comparatives.  Ex. P at 43-44.  IS employees do not actually "apply" for promotions; they are considered annually and automatically for promotions.  *Id.* Ex. L at 50.  Ms. Skaggs agrees that employees in the occupational series 436, 414, and 401 are interchangeable for promotion purposes, and IS could have placed Mr. Felder into any of those series.  *Id.* at 60-61.

Dr. Wyss now claims in his November 27, 2007 deposition that the Agency did not refuse to promote Mr. Felder from the FP-2 position to an FP-1 position; it only "establish[ed] the correct position for him."  Wyss Dep., Ex. P at 14-15, 31-32.  After reviewing the Skaggs/Wyss charts or tables (Ex. Q), Dr. Wyss states that, in looking for comparatives, "we" were looking for employees who entered IS at or around the same time, specifically between 1995 and 1999, and who were in the same series at Mr. Felder.  *Id.* at 27-29.  "We," identified as Dr. Wyss, Mr. Iwamoto, and Ms. Skaggs, in consultation with the OGC lawyers, made the joint decision to place Mr. Felder in the FP-2 position, using the 1999 Case decision, the tables, and USDA Foreign Service lateral-entry policy as tools.  *Id.* at 30-32, 50-51.  The latter Foreign Service policy does not direct or address use of comparatives in evaluating appropriate entry levels and promotions. *Id.* at 51.  In determining whether IS had any comparatives to Mr. Felder,

---

[7/] Dr. Wyss, when asked what the Agency counsel directed them to do, was stopped from responding.  Defendant's counsel objected to the question on the grounds of privileged attorney-client communication.  No reply from Dr. Wyss was, therefore, forthcoming.  Ex. P at 17.

the Agency did not take into account the length of Mr. Felder's service with IS's sister agency, APHIS/PPQ, only "his current grade level." *Id.* 46-47.

## LEGAL ARGUMENT

### I.    <u>Motion To Dismiss</u>

Defendant moves to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  This grounds of the Motion tests the sufficiency of the facts pleaded in the Amended Complaint.  *See* cases cited in Defendant's Memorandum at 10.  But all arguments Defendant advances in its Motion and Supporting Memorandum rely upon materials outside the Amended Complaint, specifically Exhibits 1-20 appended to its Memorandum.  With the exception of Exhibit 1, Judge Kessler's order of February 4, 2002, none of these appended materials is the proper subject of judicial notice or is a matter of public record.  For this reason, Rule 12(b) itself requires that Defendant's Motion "be treated as one for summary judgment." Fed. R. Civ. P. 12(b).  *See* this Court's Memorandum Opinion entered May 25, 2007 in this proceeding ("Mem. Op.") at 7-8.

### II.    <u>Motion For Summary Judgment</u>

Alternatively, Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

#### A.    The Standard of Review

This Court's Memorandum Opinion of May 25, 2007 sets forth the standard to be applied in this case for judicial review of a summary judgment motion. Mem. Op. at 8-9.  Plaintiff refers the Court to that standard as stated without further elaboration.

**B.   Exhausting Administrative Remedies**

Defendant argues it is entitled to summary judgment because Mr. Felder did not contact his EEO counselor until November 4, 2003, more than 45 days after he knew he had been discriminated against.   Mr. Felder's knowledge of this discriminatory conduct, his placement in the FP-2 position, occurred, according to Defendant, no later than January 15, 2003, the date of Dr. Wyss's second letter (Def.  Mem. Ex. 10), notifying Mr. Felder of his "assignment" to Seoul, Korea as an FP-2 Area Director.  Def. Mem. at 13.  Failing to contact his EEO counselor within 45 days of January 15, 2003, Defendant argues, violates 29 CFR § 1614.105(a)(1) and constitutes a fatal failure to exhaust administrative remedies.  Defendant has the burden of establishing that Mr. Felder did not timely contact an EEO counselor.  *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).

Plaintiff does not dispute Defendant's legal analysis.   Defendant's factual premise is, however, false on two separate levels.  First, it focuses on the wrong event, Mr. Felder's asserted knowledge of what FP-level the Agency intended to assign him upon transferring from APHIS/PPQ to APHIS/IS.  The proper focus should be upon the effective date of the official agency personnel action effectuating that transfer and, with it, the FP-class assignment.  That personnel action took effect on December 28, 2003. *See* Ex. G.  Second, it also ignores the overall context of the voluminous exchanges between the parties beginning in September 2002 and ending in October 2003. Viewed in their entirety, these exchanges establish a pattern of continuous, ongoing negotiations over the terms and conditions of Mr. Felder's instatement, including his ultimate FP level upon entry, culminating in the meeting between Mr. Felder and IS officials on October 30, 2003.  Dr. Wyss's letter of January 15, 2003 (Def. Mem. Ex. 10) is only one step, a preliminary step as it turns out, in this negotiating process.

### 1.    The "Discriminatory Event" is the Personnel Action.

The discriminatory event in question here is the FP class assignment Mr. Felder received upon his official transfer to IS.  That event is an official Agency personnel action, and, as such, its effective date is the pivotal "discriminatory event" triggering the 45-day deadline for contacting the EEO counselor, not the date when Mr. Felder knew of the FP class he would receive.  *James v. England*, 332 F.Supp.2d 239 (D.D.C. 2004) ("*James*"), *reconsideration denied* 226 F.R.D. 2 (D.D.C. 2004), *interlocutory appeal dismissed*, 444 F.3d 643 (D.C. Cir. 2006):

> This Court finds more persuasive the line of cases actually interpreting and applying the clear requirements in 29 C.F.R. § 1614.105(a)(1), which are at issue here.  In *Scarborough v. Natsios*, 190 F.Supp.2d 5 (D.D.C. 2002), the court was presented with the issue of when the 45-day clock began to run for a plaintiff who was notified on November 16, 1993 of his mandatory retirement, which would become effective on April 30, 1994.  *Id.* at 15.  The plaintiff contacted the EEOC on February 17, 1994 and filed an EEOC complaint the same day, more than two months before his mandatory retirement would become effective.  *Id.* at 15-16.  The court determined that the 45-day period commenced on the effective date of the mandatory retirement, not on the date he received notice that he was being forced to retire.  *Id.* The court reasoned that "[a]s the plain language of the regulation indicates, the 45-day filing period begins to run from the 'effective date of the [personnel] action' *not from notice of that action.*"  *Id.* at 15 (emphasis added).  Thus, the court concluded that because the plaintiff had contacted the EEOC and filed a complaint with the agency prior to the effective date of the personnel action, his administrative complaint was timely.  *Id.* at 15-16. . . .

> Each of these cases [from other jurisdictions] involved federal employees and application of the clear language in 29 C.F.R. § 1614.105(a)(1) and they all concluded that the 45-day window to contact an EEO counselor does not begin to run until the effective date of the personnel action.  Applying the same principle here, the personnel action was the reassignment to a new position and for some the reduction in grade brought about by the RIF.  The fact that the plaintiffs had notice of the RIF in March has no bearing on this timeliness analysis because it is not until the effective date of the

> personnel action that the 45-day window opened.  Thus, on July 1, 2001, when the employees returned to work in their new rolls, the personnel action became effective and the 45-day window opened at that time.  Because the plaintiffs contacted an EEO counselor prior to August 14, 2001, the date when the 45-day window closed, this Court can not dismiss the plaintiffs' claims for failure to exhaust their administrative remedies.  (Footnote omitted.)

332 F.Supp.2d at 245-46.  *Accord Silver v. Leavitt*, unreported, Civ. A. 05-0968, 2006 WL 626928 at *7 (D.D.C. Mar. 13, 2006) ("The EEOC regulations state that the relevant date [for contacting the EEO counselor] is the date on which the personnel action (here, the decision not to hire plaintiff) became effective, not the date on which plaintiff underlined of the personnel action," citing *James*.).[8]  This effective date in Mr. Felder's case is referenced in Dr. Wyss's letter of December 5, 2003 to Mr. Felder.  *See* Ex. G, second paragraph.  It is December 28, 2003, the effective date of his official conversion into the APHIS Foreign Service (*i.e.* IS).

### 2.  Mr. Felder Gains Personal Knowledge of Personnel Action at October 30, 2003 Meeting.

Assuming *arguendo* the "discriminatory event" is, as Defendant contends, when Mr. Felder first learns he would not receive a "paper promotion" upon conversion to an IS employee, the evidence of record, taken as a while, shows Mr. Felder did not know he would be entering IS as an FP-2 until the conclusion of his meeting with Dr. Wyss

---

[8] Unlike the federal employee in *McCants v. Glickman*, 180 F.Supp.2d 35 (D.D.C. 2001), the principal case upon which Defendant relies (Def. Mem. at 14), Plaintiff attacks a specific, discrete, dispositive adverse personnel action, the FP level assigned to Mr. Felder upon his conversion to IS, whereas in *McCants*, the challenged act is non-selection, a form of agency conduct that does not manifest itself through official personnel action, but there merely through a letter to the employee informing him of his "non-selection."  *Id.* at 37.  *McCants* does not discuss the effective date of the action and thus is not inconsistent with the subsequent district court decisions in *James*, *Silver*, or *Scarborough*.  *Compare James*, 332 F.Supp.2d at 245, reconciling its own holding with *Singleton v. Harkins*, 1996 WL 33322370 (D.D.C. 1996).

and Deputy Administrator Iwamoto on October 30, 2003, the culmination of a year-long set of negotiations. That knowledge may not be inferred, as Defendant claims, from the content of Dr. Wyss's second letter to Mr. Felder, dated January 15, 2003.

For its claim to succeed, Defendant must freeze that January 15, 2003 letter (Def. Mem. Ex. 10) and dissect its content in isolation from the events transpiring between the parties both before and after January 15, 2003. Contrary to the picture Defendant paints, neither Mr. Felder nor the Agency treated the so-called "assignment letter" of January 15, 2003 as anything more than a revised Agency offer of an assignment, just another step in the negotiation process, preceded and followed by other offers and counteroffers. The January 15, 2003 letter is an offer that includes a number of written and unwritten terms and conditions, a number of interrelated elements, only one of which is the subject of this Amended Complaint, the FP level. That letter offers Mr. Felder an assignment in IS (1) in a particular position, Area Director, (2) at a particular location, Seoul, Korea, (3) in a particular series, Agriculturalist, FP-401, (4) with a particular job title, "Career Foreign Service Specialist," (5) at a particular grade or FP class or level, FP-2, (6) at a particular step level within the FP-2 class, FP-2, Step 9, (7) at a specific base salary, $87,392, (8) at an unspecified effective date for transfer or conversion, to be negotiated among Mr. Felder, his supervisor, and the IS Regional Director, and (9) upon satisfying specified clearance prerequisites, medical and security clearances. The letter ends with a request that Mr. Felder notify the Agency of his acceptance of the assignment.

Preceding and subsequent correspondence between the parties negotiating the terms and condition of this proffered assignment, summarized *supra* at 4-8, demonstrate the Agency and Mr. Felder considered the "assignment" set forth in the

January 15, 2003 letter as merely an offer of a position in IS, the proposed parameters of which the letter purports to define with its proffered terms and conditions. The Agency apparently hoped Mr. Felder would accept or reject the offered "assignment" or, as it turns out, at least continue to negotiate and counteroffer over its terms and conditions. And negotiate he does and did. Mr. Felder's qualified response to the Agency's January 15, 2003 offer confirms this intent: Mr. Felder, by letter dated January 17, 2003, attached hereto as Exhibit R, advises Dr. Wyss he will accept the position as Area Director in Seoul, Korea but "pending all issues being resolved. . . ."

To recap, the other communications making up the paper trail of exchanges between the parties regarding the terms and conditions of the transition go back to September 26, 2002, the date of Dr. Wyss's letter to Mr. Felder (Ex. B), extending the Agency's initial written offer of an assignment in IS. Mr. Felder responds (Ex. C), tentatively accepting the position offered, but again "pending all issues being resolved...." His counsel concurrently enumerates "all the issues" that needed to be resolved before Mr. Felder could deem the conditional acceptance final and requests a meeting with IS officials "to discuss certain aspects of those selections, including terms and conditions not mentioned in Mr. Wyss's letter," spelling out pending issues that needed to be resolved at such a meeting. Def. Mem. Ex. 3. That meeting, held December 6, 2002, results in "an improved offer from IS" for Mr. Simmons (Def. Mem. Ex. 11 at 2), an offer actually made worse by the subsequent January 15, 2003 revised Agency offer. The January 31, 2003 letter from Mr. Felder's counsel (Def. Mem. Ex. 11) discusses ongoing efforts to persuade the Agency to revise the offers to Messrs. Simmons and Felder, clarify issues, and address the conditions and concerns previously raised.

These ongoing negotiations lead the Agency to make a further revised offer to Mr. Simmons on February 27, 2003 (Def. Mem. Ex. 12). With respect to Mr. Felder, counsel's April 14, 2003 letter (Def. Mem. Ex. 17) confirms that further negotiations are to take place and concludes with another request for IS officials to meet with Mr. Felder "before officially accepting the position offered in IS," identifying the specific issues to be discussed at that meeting. Again, Mr. Felder and Agency representatives continue to behave as negotiators of a multi-faceted contractual arrangement between the Agency and Mr. Felder, not over the assignment, but over the terms and conditions of that assignment.

Mr. Felder describes in an April 22, 2003 email to the Agency counsel (Def. Mem. Ex. 18) the remaining open issues, one of which is the requested meeting with IS officials. The Agency's May 9, 2003 response (Ex. D) demands Mr. Felder's unconditional written response, accepting or rejecting "the _offered_ positions" in IS (emphasis added), addresses unanswered questions and concerns of Mr. Felder, and agrees to facilitate a meeting with IS officials, to include discussion of "other issues as appropriate." Mr. Felder's May 19, 2003 response (Def. Mem. Ex. 19) accepts "the offer of employment in IS," subject to pursuing the open issues at the meeting scheduled with IS officials.

Mr. Felder emails Deputy Administrator Iwamoto on September 22, 2003 (Ex. E), requesting a meeting with him and the Agency Administrator "to resolve" specified topics, including the "difference in handling the particulars of my case in comparison with the handling of Mr. Simmons case (promotion)." That meeting takes place on October 30, 2003 and effectively concludes the discussions between Mr. Felder and the Agency over his assigned FP class. Mr. Felder accepts the assignment at an FP-2

-21-

grade, confirmed by Dr. Wyss in his December 5, 2003 letter to Mr. Felder (Ex. G), announcing the effective date of his conversion to IS as December 28, 2003.

Mr. Felder's EEO complaint, filed with the Agency on December 15, 2003 (Ex. H), states that he knew on October 30, 2003, following his meeting of that date with Deputy Administrator Iwamoto *et al.*, that the terms of his Agency's assignment were not going to include an FP-1 position when he reported to Seoul.

This constant give-and-take between the Agency representatives and Mr. Felder over the 14-month period preceding the October 30, 2003 meeting demonstrates that both sides considered the so-called "assignment" referenced in the letter of January 15, 2003 as little more than an offer, in fact a revised offer, subject to acceptance and negotiable as to its terms, including whether Mr. Felder would report to IS as an FP-1 or an FP-2. Mr. Felder may have known by February 27, 2003 that Mr. Simmons had received a promotion, but he did not know until October 30, 2003 that he would not be receiving one.

### 3. The Agency Should be Estopped from Asserting Mr. Felder's Knowledge Dates Back to the January 15, 2003 Letter.

If Defendant expects the Court to accept the proposition that the Agency truly believed Mr. Felder acted in an untimely manner, the Agency's conduct throughout the 14-month period in question, September 2002-October 2003, belies that assertion. The Agency representatives, including its legal counsel, continued to meet and discuss the terms and conditions of the so-called assignment with him right up to and through the October 30, 2003 meeting. It should be estopped from asserting at this stage that Mr. Felder knew he had been discriminated against on January 15, 2003. Clearly, he did not, and he continued to treat the so-called assignment, particularly as to the

specifics of its terms, including his FP class, as merely an offer subject to further

negotiations.  The Agency did, too.

Administrative deadlines, including the 45-day EEO counselor contact provision,

in Title VII cases are subject to equitable estoppel, although Plaintiff recognizes the

courts apply this doctrine only sparingly.  *See Singleton v. Potter,* 402 F.Supp.2d 12, 33

(D.D.C. 2005); *Chaple v. Johnson*, 453 F.Supp.2d 63, 69 (D.D.C. 2006), citing *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Plaintiff believes, however, the

Agency's conduct here warrants its application in this case.

## C.  Disparate Treatment Claim

At the summary judgment stage of a disparate treatment case such as this, once

the Agency asserts a non-discriminatory reason for the challenged "employment

action," whether plaintiff has made out a *prima facie* case under *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973), is no longer relevant.  *Brady v. Office of Sergeant*

*At Arms*, ___ F.3d ___, 2008 WL 819989 at *2 (D.C. Cir. Mar. 28, 2008) ("*Brady*").  The

"central question" for the district court then becomes whether plaintiff has produced

"sufficient evidence for a reasonable jury to find that the employer's asserted non-

discriminatory reason was not the actual reason and that the employer intentionally

discriminated … on the basis of race…." *Id.* at *3.  To show the Agency's stated reason

was a pretext, the employee may show that either the Agency treated similarly situated

employees more favorably or the Agency is fabricating or lying about the underlying

facts forming the predicate for the challenged employment action.  *Id.*

Here, Defendant proffers an alleged non-discriminatory reason for not providing

Mr. Felder the same "paper promotion" it provided Mr. Simmons, the absence of

"comparatives" or "comparators."  Plaintiff contends IS's stated reason is a pretext

-23-

under both recognized *Brady* alternative criteria:  IS treated a comparator, Mr. Simmons, more favorably, "paper promoting" him but not Mr. Felder, treated 10 other comparators in IS more favorably, promoting them to FP-1 positions but not Mr. Felder, <u>and</u> knew in advance that its own hiring practices would preclude finding any "comparator," as it elected to define and redefine that concept, among existing IS employees.

### 1.    The Comparator, Mr. Simmons, Is Sufficiently Comparable.

Defendant contends Mr. Simmons and Mr. Felder are not comparable for purposes of Plaintiff's disparate treatment claim.  Def. Mem. at 18-20.  Defendant cites three dissimilarities: their listings on two separate 1997 IS rosters as qualified candidates; the one-grade difference in their respective GS levels in APHIS/PPQ at the time they applied to IS; and the different FP levels in IS for which the Agency chose to consider them as potential hires.  *Id.*

These differences, while they do exist, are differences without a distinction and are inconsequential under the applicable judicial standard.[9]  This Court recently reiterated the "similarly situated" requirement standard: "To show that another individual is similarly situated, Plaintiff must demonstrate that all of the <u>relevant</u> aspects of their employment situation are <u>nearly</u> identical." (Emphasis added.)  *Smith v. Jackson*, ___ F.Supp.2d ___, 2008 WL 623230 at *15 (D.D.C. Mar. 10, 2008) (Kollar-Kotelly, J.) (citations omitted).  The requirement "must be a flexible one that considers

---

[9] Defendant also contends the similarly situated employee must be of a different race than Mr. Felder (Def. Mem. at 21); however, in this Circuit and seven other circuits, they may be of the same race or other protected class.  *See George v. Levitt*, 407 F.3d 405, 413 (D.C. Cir. 2005), citing *Stella v. Mineta*, 284 F.3d 135, 145-46 (D.C. Cir. 2002); *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850-51 (D.C. Cir. 2006); *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 347, 353-54 (3rd Cir. 1999).  Judge Kessler, in her Memorandum Opinion, provides a plausible rationale as to why IS might discriminate against Mr. Felder, and not Mr. Simmons, despite both being African Americans: as the jury may have observed, based upon the trial testimony, Mr. Felder was deemed the ringleader of the original EEO case, having "initiated the EEO activity and in general played a leadership role." Ex. A at 9, fn. 3.  *See supra* at 3.

'all relevant factors, the number of which depends on the context of the case.'" *South v. Ill. EPA*, 495 F.3d 747, 752 (7ᵗʰ Cir. 2007) (*citing Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7ᵗʰ Cir. 2007), *cert. granted* ____ U.S. ____, 128 S.Ct. 30, 168 L.Ed.2d 807 (2007)).  The Seventh Circuit in *South* elaborates on this flexibility:

> [R]ather, substantial similarity will suffice.  In short, common sense must guide this inquiry.  "[T]he inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination or retaliation."

*Id.* (quoting *Humphries* at 474 F.3d at 405).

The Felder disparate treatment claim presents a unique failure-to-promote scenario.  Mr. Felder and Mr. Simmons were not competing for the same job or vacancy or for the same promotion opportunity in connection with their instatement.  Accordingly, the cited differences are irrelevant because they would not have played any role in the Agency's decision to give Mr. Simmons a paper promotion and deny one to Mr. Felder, the proper measure of relevancy in this case.  Certainly, the Agency has never claimed these differences were a factor.  Messrs. Felder and Simmons were both former long-time management level employees of the same agency, APHIS, and of the same unit within APHIS, PPQ.  They also were  in the same occupational series, "GS-436," at PPQ, and, following their successful EEO case for non-selection, both received lateral transfers into IS from PPQ, transfers IS treated as retroactive to the same date, February 14, 1997.  Both were  placed in upper management level positions in functionally equivalent occupational GS series, "436" in Mr. Simmons's case and "401" in Mr. Felder's case.  *See* discussion *infra* at 27 regarding the interchangeability of these two series.  Because promotions within IS are not tied to placements designed to fill a specific vacant position, differences in their assigned duty stations or locations

within IS could not have played any role in their respective promotion status nor has the Agency ever claimed that it did.[10/]

One Agency official claims it is normally "easier" — whatever that means — to move from an FP-4 to an FP-3 than from an FP-3 to an FP-2 and then to an FP-1 (*see* Def. Mem. Ex. 8 at 3), but the Agency neither cites a Foreign Service or IS policy to support this proposition nor claims this subjective, results-driven perception in fact accounts for its promotion of Mr. Simmons and refusal to promote Mr. Felder.  And what does "easier" mean in this context?  More openings available at the FP-3 level? Less rigorous criteria to move up from FP-4 to FP-3?  More difficult to get a double promotion to an FP-1 in just six years?  The Agency never explains.[11/]  It does, however, assert it promoted one and  not the other because of a single factor unrelated to the claimed relative ease of moving from FP-4 to FP-3:  it contends its staff found a "comparator" for Mr. Simmons, Mr. Ken Nagata, who had been promoted, but found none for Mr. Felder.  However, that comparator, Mr. Nagata, was not promoted from FP-4 to FP-3.  He moved from FP-5 to FP-4 (Def. Mem. Ex. 6 at 3-4), negating any asserted effect of the so-called difference in the ease of moving from FP-4 to FP-3.

---

[10/] While the Agency appears to contend the Area Director position in Seoul to which Mr. Felder was assigned was necessarily limited to IS employees serving at the FP-2 level (*see* Wyss letter of January 15, 2003, Def. Mem. Ex. 10), IS can and does regularly fill Area Director openings with FP-1s, -2s, and -3s.  *See* Declaration of A. V. Simmons, ¶¶ 4-7 and Attachment, attached hereto as Exhibit S.

[11/] Regardless of what IS's explanation turns out to be, Defendant, citing this "easier" explanation, erroneously claims the numbers bear out Dr. Wyss's characterization.  Def. Mem. at 22.  However, Defendant overlooks the effect of not promoting a specific FP-2 in any one year.  The next year, that same FP-2 shows up again as an FP-2 on Ms. Skaggs's year-by-year chart of the FP-2s in IS, unless that FP-2 left the Agency.  With roughly the same pool of 20 or so FP-2s to select from, IS apparently elected to promote 13 of them to FP-1 over the six-year span in question, not at all a "low number" as Defendant contends, *id.*, and certainly a majority.

-26-

**2.    . . . And So Are 10 Other IS Employees.**

Even if the Court rejects Mr. Simmons as a comparator, the record evidence reveals the presence of 10 other "comparators," all non-African American employees of IS in job series comparable to Mr. Felder's who IS promoted from FP-2 to FP-1 between 1997 and 2002.  These 10 employees, their promotion dates, and IS entry dates and grades are listed on the Skaggs charts or tables, Ex. Q hereto.  These charts do not reveal the employees' color or race, but the affidavits of IS officials Skaggs and Wyss do:

| | |
|---|---|
| 1.   J. Mackley - white | 6.    P. Fernandez - white (Hispanic) |
| 2.   E. Quintero - white | 7.    N. Gutierrez - white (Hispanic) |
| 3.   R. Tanaka - white | 8.    D. Bailey - white |
| 4.   D. Maki - white | 9.    G. Tween - white |
| 5.   C. Castelton - white | 10.   E.  Hoffman - white |

*See* Skaggs Aff. at 5-8, Def. Mem. Ex. 6.  (Pages 5-8 of Ms. Skaggs' affidavit, taken from the ROI without redaction of surnames, are attached as <u>Exhibit T</u>.)  Dr. Wyss confirms these race/color designations in his affidavit.  *See* Def. Mem. Ex. 8 at 3-5.

IS admits that employees assigned to the GS-436, GS-401, and GS-414 series may fill promotion opportunities in any of those three series — "in IS they are considered interchangeable series for purposes of promotions." Ex. K at 2; Ex. L at 60-61; Ex. N at 23-24; Ex. O.  The Agency's own records show that, between 1997 and 2002, 10 white employees (Castleton, Fernandez, Gutierrez, Bailey, Tween, Maki, Mackley, Quintero, Tanika, and E. Hoffman) and 0 blacks assigned to these three series were promoted from FP-2 to FP-1.  *See* Ex. Q.

The only known arguably relevant difference between Mr. Felder and these 10 would-be comparators, aside from their race and color, is their length of service in IS. But this difference, while it is the one factor upon which the Agency seizes to justify its self-serving no-comparator conclusion, is misleading, irrelevant, and a carry-over from

the Agency's era of discrimination against African Americans when it filled management positions only from within. (As a result, it promoted 10 white employees and 0 black employees to the FP-1 position during the six-year timeframe at issue here.) PPQ, Mr. Felder's point of transfer, and IS are sister work units within the same agency, Animal and Plant Health Inspection Service. Mr. Felder spent 26 years in PPQ, 22 years as a manager, leaving as a GS-14. Ex. K, ¶ 6. As Mr. Felder notes in his rebutted affidavit furnished the EEO investigator, "These management positions [that he held in PPQ since 1982] were very much the same in terms of responsibility as those held by GS-436 series APHIS/IS employees at the FP-3 through FP-1 levels." *Id.* Mr. Simmons confirms Mr. Felder's assessment of the equivalency of responsibility and experience at the management level. *See* Simmons Decl. ¶ 8, Ex. S. There is no reason why this experience and length of service in APHIS/PPQ should not "count" in Mr. Felder's case towards achieving comparator status.

### 3. Inference of Discrimination Remains Even in the Absence of Comparators.

In the event the Court concludes that neither Mr. Simmons nor any of the 10 white IS employees promoted to the FP-1 level is, <u>as a matter of law</u>, a "comparator,"[12/] the inference of discrimination nevertheless remains intact under teachings of *George v. Leavitt*. Plaintiff has shown that neither of the two most common legitimate reasons for failing to promote Mr. Felder, lack of qualifications and absence of a vacancy, is the asserted basis for the Agency's decision not to give Mr. Felder the same "paper promotion" it gave Mr. Simmons. *See* 407 F.3d at 412. Significantly, the position Mr. Felder eventually did fill as an FP-2, Area

---

[12/] "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *George v. Leavitt*, 407 F.3d at 414-15, quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Director, could have been filled by Mr. Felder as an FP-1 or even an FP-3. *See* fn. 10 *supra*; Simmons Decl. ¶ 4-7 and Attachment, Ex. S.

### 4. The Failed Search For A Comparator Is A Pretext.

Once IS articulates a legitimate, nondiscriminatory reason for not promoting Mr. Felder while promoting Mr. Simmons, Plaintiff acknowledges she must respond by citing evidence establishing that IS's proffered rationale is pretextual and not worthy of credence. *See Smith v. Jackson* at *13-16. Here, taking a page from the jurisprudence for determining whether a plaintiff, claiming disparate treatment, was the subject of unfavorable action giving rise to an inference of discrimination, IS asserts that at the end of the day it searched for and found no other similarly situated employee in IS who had been promoted from FP-2 to FP-1 and, therefore, refused to promote Mr. Felder. Conversely, it claims to have located one such "comparator" for Mr. Simmons, and because that "comparator" had been promoted, it promoted Mr. Simmons.

This search for a "comparator" is nothing but a ruse designed to cover up the discriminatory intent behind IS's predetermined decision not to promote Mr. Felder. The very criteria IS elected to employ for defining "comparator" were slanted to ensure IS would never find a comparator for Mr. Felder, and, moreover, the parameters of those criteria became a moving target, constantly changing as Mr. Felder's request for promotion and his subsequent EEO case progressed.

### a. *Even IS's Reason For Selection of the Articulated Rationale Remains Hidden*

Defendant argues that Judge Kessler's instatement order <u>required</u> IS to provide former plaintiffs Felder and Simmons paper promotions between their retroactive instatement date of February 14, 1997 and the dates of their respective

conversions from PPQ employees to IS employees if similarly situated IS employees had received promotions during this same six-month period.  Def.  Mem. at 19.  This stated premise for IS's eventual articulated "business reason" for promoting Mr. Simmons and passing over Mr. Felder is nothing more than conjecture, Defendant's *post hoc* spin on what IS officials may have contended they were searching for and what they may  have believed was the driving force behind that subsequent search.  As noted, *supra* at 14, fn. 7, Defendant cut off Plaintiff from exploring this very topic with the key Agency witness during his deposition based upon an objection from counsel asserting the attorney-client privilege.  Ex. P at 17.  Dr. Wyss as well as Ms. Skaggs insist that Agency counsel directed them to search IS records looking for "comparators" entering IS somewhere in the 1997 time frame at the FP-2 level and then tracing their promotion history.  Whether perceived compliance with Judge Kessler's instatement order, as Defendant now claims in its Supporting Memorandum, played any part in that directive, and, if so, how, are matters not of record.

Plaintiff has made it abundantly clear that, in her opinion and as reiterated in this Court's Memorandum Opinion of May 25, 2007 at 11-12, Judge Kessler's instatement order and accompanying Memorandum Opinion are silent on the issue of promotions for Messrs. Felder and Simmons.   Certainly, none was ordered. Plaintiff's position is and has always been that IS was under no legal obligation to promote either former plaintiff, but because it elected to promote Mr. Simmons before his official conversion date, it was discriminatory not to promote Mr. Felder as well.

### b.  *The Evolution of the Articulated Reason*

The credibility of IS's stated reason for not promoting Mr. Felder begins to crumble away as its articulation of the criteria for this elusive "comparator" materially changes over time and the explanation of those criteria varies from IS official to official.

The very first IS articulation of the "business reason" comes from Agency counsel who eventually directed Ms. Skaggs and Dr. Wyss to search the Agency records for comparators.  Counsel Campbell, in her letter of May 9, 2003, explains for the first time the IS rationale for not promoting Mr. Felder: "[t]he record is clear that most individuals working in IS in 1997 at the FP-3 level remain at the FP-2 level today."  Ex. D at 2. Thus, IS's initial proffered reason for non-promotion breaks down into five subparts:  (1) it is based upon a *per capita* averaging (2) of those IS employees working in (not entering) IS in 1997 (3) at the FP-3 level (4) who are, prior to May 2003, promoted to the FP-2 level (5) to determine what percentage have, by May 2003, received a second promotion to the FP-1 level.  The apparent litmus test of this initial rationale boils down to determining whether a "majority" (*i.e.*, more than 50%) of these original FP-3s has reached the FP-1 level by May 2003.  No mention is made in the articulated rationale of job series, length of service, or date of entry.  This initial rationale proffered by Counsel Campbell appears consistent with what the Agency representative told the EEO counselor handling Mr. Felder's case.  *See* Felder Aff. at 2, Def. Mem. Ex. 2.  Mr. Felder would, moreover, appear to qualify for the promotion under that "majority" test. *See supra* at 26, fn. 11.

One year later, IS has abandoned its first proffered "business reason," the "majority" theory, for not promoting Mr. Felder.  The next iteration of the IS rationale, the "comparator" theory, emerges in the carefully orchestrated affidavits of IS officials in July 2004, responding to the EEO investigator's request for an agency answer to Mr. Felder's administrative EEO complaint and his initial affidavit.  Ms. Skaggs claims Agency Counsel Campbell directed her to search Agency records looking only for IS employees entering IS between June 1997 and December 1998.  Skaggs Aff. at 3-4, Def. Mem. 6.  Her search turned up only one new-hire, Ken Nagata.  IS deemed Mr. Nagata to be a comparator of Mr. Simmons because his employment was "close" to and thus "paralleled" Mr. Simmons.  *Id.* (Mr. Nagata entered IS as an FP-5, not as an FP-4 like Mr. Simmons, and was promoted to an FP-4,  not to an FP-3 like Mr. Simmons.)  IS refused to consider Mr. Nagata a comparator of Mr. Felder because of their FP-level differential.

Dr. Wyss clarifies that he understood the instruction from Ms. Campbell to require searching just for those employees entering IS in 1997.  He contends IS followed the State Department and USDA Foreign Agriculture Service policies on handling lateral entries in Mr. Felder's case, while using the "comparator" method for determining his promotion entitlement.  Wyss Aff. at 3, Def. Mem. Ex. 8.  He adds a new wrinkle to the comparator criteria parameter, observing that promotions are series-specific and are easier to secure when moving from an FP-4 to an FP-3 than when seeking to be double-promoted from FP-3 to an FP-1.  *Id; accord* Ex. L at 35-36, 39.

Three years later, the depositions of IS officials taken in November 2007 in the discovery phase of this case yield yet another version of this non-existent comparator and the parameters IS assigned to the vain search for him or her. They now admit IS did not use the State Department or Foreign Affairs Manual in processing Mr. Felder's request for promotion. Ex. L at 32-33. Now, according to Dr. Wyss, the entry period IS used in looking for comparators was framed by those IS employees hired between 1995 and 1999. Ex. P at 27-29. He confirms that IS did not take into account the length of time the identified FP-2s employees served at that level before their promotions to FP-1, but concedes this duration would be a relevant factor in determining whether Mr. Felder had a comparator. Ex. P at 43-44. Dr. Wyss also reconfirms that Mr. Felder had to be in the same occupational series as the comparator. *Id.* at 27-29.

### c. *The Evidence of Incredulity Is Overwhelming*

IS knew in advance the allegedly non-discriminatory basis it selected and ultimately articulated as the rationale for not promoting Mr. Felder would produce no comparators. It had in place and followed an extant policy that precluded IS from hiring from outside of IS to fill top-level management positions, FP-4 through FP-1: IS confined itself to filling them through internal promotion. Ex. L at 12-13. By delineating a potential "comparator" as someone IS hired from outside the agency during the 1997-1998 period to fill an upper-management position, IS effectively guaranteed itself that it would not have to consider a "paper promotion" for Mr. Felder. *See* Ex. L at 41-43. The Agency rationale thus is a sham by design.

Casting further doubt upon the credibility of the "comparator" rationale as it was applied, Dr. Wyss concedes that its criteria did not take into account, but should have, the length of time other FP-2s in IS had to wait for their promotions to FP-1. Ex. P at 43-44. Thus, if any of the 10 identified white FP-2s who were promoted to FP-1 between 1997 and 2002 had to wait fewer than five or six years for that promotion, the overall length of their service in IS, the factor relied upon (improperly, Plaintiff contends) to exclude consideration of Mr. Felder, would have been erased or at least neutralized as a relevant parameter. Moreover, excluding consideration of Mr. Felder's extensive years of comparable service and experience as a high-level manager at PPQ from IS's chosen comparator parameter only serves to confirm the irrationality of that parameter, further undercutting its legitimacy as a non-discriminatory reason for not promoting Mr. Felder. At a minimum, a jury should be permitted to decide whether IS's decisions to ignore the length of time other would-be comparators served as FP-2s before their promotions and the length of time Mr. Felder served in management in a sister unit of APHIS constitute choices based upon valid distinctions. *Compare Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000). When, as here, the basis for the Agency's stated reasons for non-promotion is flawed and inexplicably unfair, summary judgment must be denied. *Compare Mastro v. Potomac Elec. Power*, 447 F.3d 843, 855-57 (D.C. Cir. 2006).

IS's insistence on the defined comparator being assigned the same occupational series as Mr. Felder conflicts with its own written policy that, for promotion purposes, three related IS series (436, 401, and 414) are interchangeable. Ex. O, Ex. K at 2, Ex. L at 60-61, and Ex. N at 23-24. Freed of

that erroneous constraint, IS's own chart of potential "similarly situated" comparators, Exhibit Q, depicts 10 white comparable employees who IS promoted to the FP-1 level between 1997 and 2002. *See supra* at 27-28.

The rationale IS articulates for non-promotion also conflicts with IS's established policy of following the guidance of the manual issued by the Department of State and its own Foreign Agriculture Service branch for promotions. *See* Def. Mem. Ex. 6 at 2, Ex. 8 at 3; Ex. M at 3. As Ms. Skaggs admits, IS did not apply the protocol from that manual to Mr. Felder's case, and that manual contains nothing about the use of comparators to determine eligibility for promotions. Ex. L at 32-33, 35; Ex. P at 51.

The Ms. Skaggs-prepared charts or tables, Exhibit Q, prepared at the request of and given to Agency Counsel Campbell (Ex. L at 44-45), remain an enigma: what possible role did they play or purpose did they serve in IS's promotion decisionmaking process? The Agency had already determined it had hired only one employee in the 1997-1998 time frame and had concluded that this employee, Mr. Nagata, an FP-5, could not, by the narrow definition of "comparator" Dr. Wyss and Ms. Skaggs had been given, be deemed a comparator of Mr. Felder. This apparent anomaly sheds further doubt on the credibility of IS's "comparator" rationale.

Plaintiff (and this Court) will never know the answer to the above question and are left to speculate because the ultimate decisionmaker to whom the charts were provided was Agency counsel (Def. Mem. Ex. 6 at 2), Ms. Ayoka Campbell, and Defendant refused to produce her for deposition on the grounds of attorney-

client privilege and refused to answer interrogatories based upon the same privilege. *See* attached <u>Exhibit U</u>, the letter from Plaintiff counsel to Defendant counsel, dated September 25, 2007, to counsel for Defendant, noticing Ms. Campbell's deposition and commenting upon Defendant's objection to producing her, [13/] and attached <u>Exhibit V</u>, Defendant's answers to interrogatories, citing (beginning on page 5) reliance upon advice of and instructions from counsel. Consistent with this approach, Defendant counsel, during deposition testimony of Dr. Wyss on November 29, 2007, objected, on the basis of attorney-client privilege, to the questioning of Dr. Wyss about the instructions and directions he had admitted receiving from Agency counsel regarding the search for a comparator. Ex. P at 17; *see supra* at 14, fn. 7.  It thus appears Defendant's agency witnesses claim they relied upon advice of and instruction from counsel, in fact pointing to Agency counsel as the ultimate decisionmaker, while Defendant's counsel continues to block Plaintiff from exploring with those same Agency witnesses the nature and scope of that advice because the answers would constitute privileged attorney-client communications.

Defendant's litigation maneuvering, simultaneously asserting IS relied upon advice of Agency counsel and insulating Agency counsel's communications from disclosure by invoking attorney-client privilege, amounts to a procedural shell

---

[13/] The whited-out portion of the September 25, 2007 letter, Ex. U, deletes a discussion of possible settlement parameters.

game.[14/]  Defendant can not have it both ways, its Agency witnesses using advice of counsel as a sword to establish or aid in establishing its defense while its counsel invokes attorney-client privilege as a shield to avoid having its witnesses answer questions about that advice and defense.  *See Intex* at *4, citing *Aspex Eyewear, Inc. v. E'lite Optik, Inc.*, 276 F.Supp.2d 1084, 1092-93 (D. Nev. 2003). This procedural "gotcha" goes to the very heart of Plaintiff's contention that IS is trying to cover up its true motive for not promoting Mr. Felder, discrimination against him because of his race and in retaliation for his hand in the successful prosecution of his and Mr. Simmons's EEO claim against IS for non-selection.

## CONCLUSION

For the reasons stated herein, Defendant's Renewed Motion To Dismiss or For Summary Judgment should be denied.

---

[14/] Plaintiff does not, however, suggest Defendant's counsel has engaged in any improper or unethical conduct.  On the contrary, his conduct throughout has been exemplary, completely above board and beyond reproach.  Rather, it appears Defendant and IS have waived their right to invoke the protection of the attorney-client privilege once IS elected to hide behind the advice of and communications from counsel as the basis for taking the adverse employment action that is the subject of this Amended Complaint.  *See e.g., Intex Recreation Corp. v. Metalast, S.A.*, not reported, 2005 WL 5099032 at *2-3 (D.D.C. Mar. 2, 2005); *In re EchoStar Communications Corp.*, 448 F.3d 1294, 1297 (Fed. Cir. 2006).

Respectfully submitted,

_____/s/_____

Due and Filed:                KIM D. MANN, D.C. Bar # 81471
April 30, 2008                Scopelitis, Garvin, Light, Hanson & Feary
                              1850 M Street, N.W., Suite 280
                              Washington, DC 20036-5804
                              (202) 783-9222
                              (202) 783-9230 (fax)

                              **Attorney for Plaintiff**
                              **Barbara K. Felder**

-38-